298 So.2d 71

**James SMITH**

v.

**STATE.**

**6 Div. 571.**

Court of Criminal Appeals of Alabama.

July 16, 1974.

------♦------

Calvin M. Howard, Birmingham, for appellant.

William J. Baxley, Atty. Gen. and J. Richard Piel, Asst. Atty. Gen., for the State.

HARRIS, Judge.

Appellant stands convicted of murder in the second degree and the jury fixed his punishment at thirty (30) years imprisonment in the penitentiary. He was represented by retained counsel at his arraignment and trial. After trial he was declared an indigent and a free transcript was furnished him. New counsel was appointed to represent him on appeal.

On Sunday morning, December 17, 1972, appellant and the deceased rode together in deceased's car to a "shot house" operated by Cora Mae Davis in the Homewood Community of Jefferson County. They had known each other for some years and had been on friendly terms. They had hunted and fished together. They lived on the same street in Homewood. Prior to this Sunday, they had been going with the same woman and had quarreled over her. They arrived at the "shot house" around 10:00 A.M. and started drinking beer and gin. After a few drinks, the deceased renewed the argument about the woman and told appellant that he (deceased) had "beat his time." Appellant was armed with a pistol and this statement upset him. The deceased was unarmed. When he saw appellant's pistol, he went to the telephone and called his grown son and told him he was having trouble and the circumstances thereof. Shortly thereafter the son of the deceased and two companions, one of whom had a pistol, arrived at the "shot house" to be on hand in the event of further trouble. When this trio arrived, the deceased bought a round of drinks for them and his son moved close to where appellant was sitting. He told appellant that he understood he wanted to whip his father and said, "I'm sure you don't want to whip my dad." Appellant got up and moved to another place in the house and deceased's son moved close to him again. Appellant then pulled his pistol and pointed it at the head of the son of the deceased. The son said, "Man, you are crazy", and ran out of the room and shouted to his friend who came to the house with a pistol. The man with the pistol cocked the hammer and told appellant to put his pistol up and appellant complied with this order.

The deceased's son left the "shot house" and went to his father's home and got a 20 gauge pump gun, loaded it with three buck shot shells and started back to the "shot house." He was intercepted by the deceased and the other two men who came to this place with deceased's son. They told him to put the shotgun back in the car. They all returned to the home of the deceased where his son unloaded the shotgun

and handed the empty gun to the deceased. The son and his two companions left the home of the deceased and went back to their employment of driving taxi cabs.

When appellant left the "shot house", a friend in the neighborhood called him into his house and told him not to go in the direction of deceased's home as they were waiting for him with a pistol and shotgun. Appellant used the telephone and called his wife to take their children and go to her mother's house as there might be some shooting going on. Appellant then said he was going home. He started home but changed his mind and decided that he would go to the home of the deceased and ask him why he tried to "set him up." Appellant was mad when he went to the home of the deceased and knocked on the door. When he got to the home of the deceased, he called him out of the house on the porch and started beating him on the head with the pistol. According to appellant, the pistol went off and the deceased was shot in the head. The deceased was still unarmed. Several witnesses heard the shot, saw the deceased lying on the porch, and saw appellant walking toward his home with a pistol in his hand.

The deceased was carried to the University Hospital where a team of neurosurgeons performed a craniology on the night of December 17, 1972. The next morning his convalescence was turned over to another service in the hospital under the supervision of Dr. William Carver Woodall. Dr. Woodall's qualifications were admitted by counsel for appellant and in response to a question concerning the brain of the deceased, Dr. Woodall testified:

"He had sustained a gunshot wound which entered the front of the head on the left side and had gone through the brain on the left side, crossed over and had entered the brain on the right side. All of this had been, the dead brain had been removed and all the fragments had been removed from the brain."

Dr. Woodall further testified the deceased never reached a state of full consciousness and died on December 26, 1972. The doctor said:

"His immediate cause of death is listed on the death certificate as pneumonia, but you cannot separate the two. The gunshot wound placed him in bed. It prohibited him from clearing his lungs of secretions from expending them fully, so that the lungs, over a period of time, became congested. With the congestion, follows infection, following pneumonia which followed death. So, that it's a continuing—The death certificate also states that the pneumonia was secondary to the gunshot wound."

The doctor further said, "I don't think there's any question that the gunshot wound to the head predisposed him to pneumonia." The doctor also expressed the opinion that the gunshot wound was serious and that death would have resulted therefrom.

After the shooting, appellant left his home and went to another community in Jefferson County. That same night he got a cousin to call the Homewood Police Department and tell them he was coming in and surrender. He and his wife arrived at the station house around 7:00 P.M. His wife handed the pistol to an officer saying, "This is his gun." The officers had a charge against appellant for assault with intent to murder and he was formally placed under arrest. Appellant then turned over to the officers a number of unspent bullets.

The officers gave appellant the *Miranda* warnings from a card that is now standard procedure and he signed a waiver form. He gave the officers a statement which was written by one of the officers. It was read back to him and he also read the statement after which he signed it in the presence of two officers who witnessed his signature. On voir dire examination out of the presence of the jury, the trial court determined the statement was voluntary

and it was admitted in evidence. The statement is as follows:

"STATEMENT
TIME 7:20 pm    DATE 12–17–72    PLACE City Hall

"I, (James Smith)/s/ James Smith HAVING been advised of my rights under the FIFTH AMENDMENT to the CONSTITUTION as to compulsory self incriminating, my right of counsel and my right of trial, and knowing that anything that I say may be used against me in a court of law, and knowing that I do not have to make any statement at all do hereby volunteer the following to Sgt. J. A. Barker, who has identified himself as a police officer for the City of Homewood. On Dec. 17, 1972 about 3:00 pm I was at Cora's house on Central Ave. Willie Ezzell was there also, we had went (/s/ J.S) up there together in Ezzells (sic) car. We had been in a fuss about a woman, I thought it was all over untill (sic) this morning, when Ezzell told me he had called his son and told him about our trouble, he said he will be over here in a few minutes. When his son came he had about four other guys with him, one of them had a 38 cal. pistol. They all came to Coras (sic) house. Ezzell told them that we had been in to it, and they started watching me, his son got real close to me, everytime I would move his son would move with me. I then said Well I'm going to leave, and I went out the door, as I left I saw this guy with a pistol in his hand. I went on up to Willie Bee house on 26th Ave, while I was there Bo legs Rowser, & Mac Postell came in and told me not to go outside that they are waiting outside with a shot gun. Later I got a call from Alex Rowser and he told me to come over to his house, I went to his house and he told me not to go home, because they had gone down in front of my house and parked. He said they had a sawed off shot gun and a automatic shot gun, (sic) he said they had taken the guns from the trunk of the car. I told

him that I had to go home, because I had a family down there and I had to check on them. I then left and went home, when I got there the car had gone I was thinking to myself that Ezzell had set me up for this, and I got mad and went and knocked on his door, when he came to the door, I ask him why he had set me up like this and started hitting him on the head, this is when the gun went off. Ezzell fell on the porch, and I went next door to my house. I then left walking I thumbed a ride to Tittisville, (sic) and then went to the North side to my couison's (sic) house. I told my couison (sic) to call the Homewood police that I was turning myself in to them. I knew that I had done the wrong thing and wanted to give up.

"I have read the above statement consisting of 2 page/pages and attest that it is a true and accurate account of the events which took place on 12–17–72. It was given by me freely and voluntarily without fear of threat or promise of reward.

WITNESSED BY Sgt. J. A. Barker /s/ James Smith
                                                SIGNATURE
WITNESSED BY Earl W. Littlefield, Jr.
Page 2 of 1
X_____
X_____

"This is to certify that the foregoing is a true and correct copy of the original statement.

"Dated this 20th day of June, 1973.

"Cassie Lee Miller (SEAL)
Notary Public"

Appellant testified in his behalf and contradicted his written statement that he was pistol whipping the deceased on the head when the weapon discharged and struck him in the head. He also denied that he got mad and decided to search out the deceased and ascertain why he had tried to "set him up." He admitted walking upon the porch and calling the deceased and he admitted that he had his pistol in his hand at the time. He claims that when the deceased came to the door he saw the pistol in his hand, opened the screen door and

grabbed the pistol, and in the struggle over the pistol it went off and he saw the deceased fall. This shocked him so he just turned and walked away.

Where the evidence raises a question of fact for the jury and is sufficient to sustain the conviction, refusal of the affirmative charge does not constitute error. Sellers v. State, 48 Ala.App. 178, 263 So.2d 156; Sidney v. State, 265 Ala. 136, 89 So. 2d 745; Young v. State, 283 Ala. 676, 220 So.2d 843.

Appellant made a motion to exclude the state's evidence. The court denied the motion. The evidence presented by the state was more than ample to submit the issue of guilt to the jury. No error intervened here. Young v. State, supra.

A pistol is a deadly weapon *per se* and the intentional and unjustifiable use of such a weapon in a deadly manner raises a presumption of malice, and such presumption prevails unless the circumstances surrounding the killing rebuts the presumption and overcomes it. Tolen v. State, 49 Ala. App. 353, 272 So.2d 279.

The deceased was gunned down on his own porch and was defenseless at the time. All the evidence in the case shows that he was not armed at any time while in the presence of appellant. There is no semblance of self defense in this case. It is true that while at the "shot house" appellant was in an atmosphere of hostility and that he was, in some measure "ganged upon", but he was the first person who pulled a pistol. One of the trio who came to this house cocked his pistol and made appellant reholster his weapon, and everyone aligned on the side against him left the premises. The hostile demonstration was over. An hour elapsed before appellant went to the home of the deceased to renew the argument between them and pursue the difficulty. There was plenty of cooling time, but appellant refused to cool off. No doubt jealousy raised its hideous head and appellant sought out the deceased to avenge his apparent loss of the affection of Cora Mae Davis, the operator of the "shot house", which now ran in favor of the deceased. This was a senseless killing. It is simply the story of two warring lovers vying for the affection and favors of the same woman. It doesn't usually work on a share basis—someone loses. Here both lost. The deceased went to his reward and appellant became a ward of the state and Cora Mae is going her merry way.

From what we have said it is clear that there was no error in overruling and denying the motion for a new trial.

There was no error in the refusal of the written charges. The principles of law contained in the refused charges were adequately covered in the oral charge or in the written charges given at the request of appellant.

As in duty bound, we have diligently searched the record for errors injuriously affecting the substantial rights of appellant and have found none. It is ordered that this case be, and the same is hereby affirmed.

Affirmed.

ALMON and TYSON, JJ., concur.

CATES, P. J., and DeCARLO, J., not sitting.